Filed 5/29/25  P. v. Tefera CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C097275 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-158175) |
| v. | |
| DAVID TEFERA, | |
| Defendant and Appellant. | |

At trial, defendant David Tefera admitted for the first time that he killed his wife, T.T., but claimed it was in the heat of passion when he found another man in their bedroom.  The prosecution's evidence suggested that he murdered her after several years of trying to control her through emotional abuse.  The jury found him guilty of first degree murder.  On appeal, defendant contends that four evidentiary errors—individually and cumulatively—denied him a fair trial:  (1) the court erred in admitting entries from his wife's diary from six to 12 years prior to the murder in which she recorded instances

1

of defendant's abuse and threats; (2) no jury admonishment was sought or given after sustaining an objection to the prosecutor's question as to whether defendant's daughter previously threatened to commit suicide; (3) the court erred in allowing defendant's daughter to testify as a rebuttal witness; and (4) the court erred in allowing a witness for the prosecution to testify that defendant's expression of grief at his wife's funeral was "exaggerated." We find no prejudicial error and thus affirm.

## BACKGROUND

A. The Prosecution's Case[1]

1. Defendant's relationship with the victim

T.T. worked outside the home and defendant was the primary caretaker of their two children, daughter H.T. and son A.T. Defendant had a history of suspecting T.T. was unfaithful to him. At one point while the children were young, he paid for DNA tests, the results of which confirmed they were both his biological children. Between 2014 through 2018, defendant told his friend that T.T. routinely locked herself in the bedroom after dinner and that he thought she was having an affair. He also suspected T.T. was going to divorce him, began referring to T.T. as his "future ex-wife," and researched the likely financial impact of a divorce. When defendant's friend heard of how T.T. died, he said to defendant, "[D]on't tell me. If you did it, I don't want to know."

T.T.'s friends and coworkers testified to what T.T. told them about her relationship with defendant. She told friends that she was afraid of defendant and felt he controlled every aspect of her life, including what clothing she wore. He would frequently be upset if she worked late or mentioned male coworkers. He also contacted coworkers to see if T.T.'s account of her workday was accurate. T.T. was afraid to go to work sites if she did not have a female coworker to accompany her.

---

[1] Throughout trial, an interpreter for the Amharic language was used for defendant's benefit. No issue is raised regarding such use.

2

T.T. also disclosed to her work colleagues that she was having difficulties in her marriage. She told her male supervisor that defendant threatened her and the children's lives and that he would take A.T. to Ethiopia and she would never see him again. Her supervisor provided her with information about a domestic violence resource center and helped her devise a way to go to the center without defendant's knowledge.

T.T. confided in a female work friend that she was very afraid of defendant but would not divorce him, in part due to financial reasons, and also because she was afraid that he would hurt the children. T.T. told another female work friend, G.A., that "He's got nothing to lose. If I go, he will find me, and he will kill the kids."

G.A. testified to several instances of defendant's controlling behavior, as relayed to her by T.T. For example, one day, T.T. had a hair appointment. Although defendant did not want her to go alone, she did so. Defendant called her and said, "Your son is dead." T.T. rushed home and saw defendant in the car with H.T. As she approached, defendant drove forward, making her repeatedly run after him. Eventually, defendant let H.T. out of the car. T.T. asked H.T., "Is your brother dead?" H.T. replied, "No. He's fine. He's in the car. Dad just told you that."

Another time, as relayed by G.A., when the family was expected to leave for vacation, defendant vacillated between telling T.T. that she could and could not leave. Eventually, defendant told her she could take H.T. but had to leave A.T. T.T. was under the impression defendant would take A.T. away while she was gone. T.T. was afraid to leave her children alone with defendant.

G.A. testified that she found a notepad in or on T.T.'s desk with diary entries in T.T.'s handwriting. She read several of T.T.'s entries to the jury, and many of them were consistent with what T.T. told G.A.

G.A. further testified that T.T. also sought counsel from her family. Sometime around 2007 or 2008 the family traveled to Ethiopia. While on the trip, T.T. told her family and defendant's family about the difficulties in the marriage. Both families urged

3

her to leave him. When defendant learned of this incident, he became angry and refused to return to the United States with T.T. for some time. During that time, T.T. felt both liberated and fearful of his return. After he returned to the United States, the marriage was initially better but months later he again became controlling and accused T.T. of cheating.

At one point, T.T. also spoke to her priest about the marital problems. The priest told T.T. to pray for defendant and be patient with him.

### 2. Defendant's visit to the cemetery

In the month before defendant killed T.T., he contacted a cemetery about pricing options and locations for a single burial plot. A funeral service advisor arranged to pick defendant up at an address, which turned out to be a Safeway grocery store, and took him on a cemetery tour. When asked by the advisor, defendant did not say for whom the burial plot was intended, but said no one was ill and his wife did not wish to see the site. He also asked the advisor whether a body would go directly to the funeral home if an individual were to pass away at home. After T.T. died, defendant came back out to the cemetery and again looked at burial sites.

### 3. Day of the murder

On January 19, 2018, T.T. made breakfast for A.T. and helped him get ready for school. A.T. then walked to school. T.T.'s friend was scheduled to arrive that day from Ethiopia. At 2:29 p.m., defendant called 911 and said his wife was dead and not breathing. He said it seemed like someone was in the house because the door was open.

At 2:34 p.m., the fire department arrived at defendant's home. The captain-paramedic entered through the closed front door and saw T.T. lying on her back, a couple of feet away from the doorway. T.T.'s head was towards the door and her feet were pointed the other direction. Defendant was straddling her attempting to perform CPR, but she had no signs of life. T.T.'s jaw was clenched, rendering attempts to manage her airway difficult. The captain observed that T.T. had extensive bruising over her eyes and

4

forehead. At least two first responders, including the captain, were suspicious because there were no signs that T.T. had tripped, and the injuries to her face were not consistent with how her body was placed. Defendant told the captain that he had last seen T.T. between 10:00 and 11:00 a.m. and that he did not move her body.

Defendant was emotional when he spoke with the captain. Another first responder on the scene[2] could hear defendant talking and crying. He believed defendant's crying to be "theatrical" because, "[defendant] seemed to be able to turn on this wailing and crying and turn it off kind of at will . . . ."

When Detective Patrick Ganguet arrived on the scene, defendant was having difficulty breathing and was being assessed by first responders. Defendant told Detective Ganguet that he left the house that morning around 10:50 a.m. His plan was to purchase lamb for a religious celebration. He ultimately decided against it, but his return home was delayed by car issues. At 2:27 p.m., defendant called T.T. but she did not answer the phone. Defendant arrived home at approximately 2:30 p.m. and found T.T. lying on the floor in the entryway. During the conversation with Detective Ganguet, defendant's demeanor varied from calm and conversational without much emotion to a few short bursts of crying or wailing.

4. The investigation

The medical examiner who performed T.T.'s autopsy did not believe the cause of death was natural or accidental. He observed that her eyes were black, swollen, and she had multiple bruises and scrapes on her face, neck, and head. The marks on her neck were indicative of strangulation.[3] Several injuries were consistent with multiple hits

---

[2] Although this firefighter-paramedic believed T.T. was dead as soon as he arrived on the scene, he attempted to provide aid for approximately 20 minutes.

[3] A senior criminalist found defendant's DNA in the fingernail scrapings from T.T.'s right and left hand, as well as on various areas of T.T.'s neck.

against a hard surface. The medical examiner opined that death was caused by manual strangulation with a contributing cause of blunt force injury. To cause death by manual strangulation, the pressure on T.T.'s neck would have to be maintained for at least two minutes. The medical examiner also indicated that if a deceased person's jaw is clenched at 2:34 p.m. (as described by one first responder) a reasonable estimate of time of death was within an hour or an hour and a half prior to that observation.

Through cellular location data, Detective Ganguet determined that defendant's cell phone left home early on the morning of the murder and returned home at approximately 8:00 a.m. It left home again at 1:55 p.m. and drove to the outskirts of the city, near the county landfill. The cell phone arrived back home at 2:29 p.m.

Detective Adrian Coughlan also interviewed defendant, who largely repeated his original account of his day. Detective Coughlin also reviewed security footage from houses in defendant's neighborhood. One video captured defendant returning home at 8:17 a.m. At 12:57 p.m., a video from two houses away from defendant's house captured the sound of a woman screaming. Another video captured defendant when he left the neighborhood again at 1:55 p.m. and returned at 2:28 p.m.

Detective Coughlin pressed defendant, saying that he knew T.T. was murdered and that defendant was home at the time. Detective Coughlin told defendant that he "just wanted to know what had transpired in the house at that time just between the two of them that had precipitated the murder." Defendant never took responsibility for T.T.'s death.

Defendant was also interviewed by an investigator with child protective services; they spoke over tea. He told her that on the day of the murder, he entered the house through the garage and found T.T. on the ground. He believed she had fallen, hit her head on the counter, and attempted to get to the front door for help. He thought she fell

6

because she had vertigo.[4]  Defendant also theorized that an intruder came into the home and assaulted T.T.  At no time did defendant admit he caused her death or say that he had found another man in the house.

Defendant also told the investigator that he believed T.T. was having an affair with her male supervisor.  Defendant believed the supervisor was ruining his life and referred to him as his "sworn enemy."  During this interview, defendant's behavior shifted from polite to angry and aggressive.  He said he was "a peaceful guy, and he never even pushed [T.T.]."  Defendant ended the conversation by telling the investigator that if they had met under different circumstances, he would take her out for coffee.

B.  Defense Case

Defendant produced several witnesses who knew him from church.  None of them ever noticed anything out of the ordinary between defendant and T.T.  They described defendant as a nice guy:  decent, respectful, and peaceful, with a reputation for being calm.

Defendant testified that he had a good relationship with T.T., despite the possibility that she was unfaithful.  He claimed that when T.T. was pregnant with A.T., he saw her kiss a coworker.  He suspected that T.T. was unfaithful and that A.T. was not his biological child but the results of a DNA test confirmed A.T. was his son.  Then, after T.T. started working at her latest position, he suspected she was having an affair.  One day, T.T. told him she had to stay late at work to help her boss finish a project.  The next day, defendant noticed that the passenger seat in the car was "backed up" and leaning all the way back.  Defendant also found an earring on the car floor.  When he asked T.T. about the seat and the earring, she got upset and started to cry.  She said she would, "confess

---

[4]    This was not otherwise corroborated at trial.  In fact, the "most significant thing in the medical records" was that she suffered from gallstones.

[her] deeds to [their] pastor in church." Defendant did not press T.T. about the affair. He was satisfied she would confess, and he wanted to move forward.

Defendant suspected T.T. was cheating when she spoke with her boss at their holiday parties. Defendant denied that they ever discussed getting divorced. Despite his suspicions, defendant thought their relationship was going well leading up to the day of the murder.

On the day of the murder, T.T.'s friend was arriving from Ethiopia for a visit, and they planned to celebrate a religious holiday. At approximately 11:00 a.m., T.T. asked defendant to go buy a grass-fed lamb for their celebrations. He started out toward two different butcher's shops. At one point defendant pulled to the side of the road and tried to call T.T., but he realized that he forgot his phone at home. Car trouble ensued. When defendant finally arrived home, he told T.T. he did not buy the lamb. He worked around the house and, at some point, he heard a cough coming from the master bedroom.

Defendant searched the bedroom and found an unknown man underneath the bed. T.T. ran and picked up defendant's gun that he kept in the closet. T.T. would not disclose the man's identity. Instead, she screamed at defendant, "I'm tired of you," and "I'm done. I want you out of my life." T.T. pointed the gun at defendant and they all walked to the family room. At T.T.'s request, defendant kneeled. Defendant suggested that they call the police. T.T. threatened to shoot him. Eventually, defendant heard the front door open and close. The man was gone and T.T. did not have the gun.

T.T. told defendant, "You can't touch me. You can't do anything to me." T.T. grabbed a knife from the kitchen, and defendant hit it out of her hand. T.T. tripped over a stool in the kitchen and hit her head on the corner of the counter. She fell to the ground and hit her head again. Defendant fell on top of T.T. and they continued to fight. Eventually, they each rose, and defendant went toward the door. He looked back and saw T.T. with a rod or stick in her hands. They struggled over the rod, and defendant shoved

8

it against her body and throat. T.T. fought back and defendant grabbed her neck, pushed away from her, and left.

Defendant drove around the neighborhood, looking for the man who had been in their house. As he was driving, defendant thought of T.T. and wondered if she needed help. Defendant called her on his way home, but she did not answer. When Defendant returned home, he found T.T. on the ground and called 911. Defendant did not tell the police about what happened because he was afraid that he might be tortured or taken away from his children.

C. Prosecution's Rebuttal, the Verdicts, and Sentencing

Defendant and T.T.'s daughter, H.T. testified as a prosecution rebuttal witness. She testified that during her childhood she saw defendant and T.T. verbally argue. Defendant was often the aggressor, and her mother would attempt to diffuse or remove herself from the situation. Defendant was quick to become angry. She provided one example where defendant struck H.T. across her face when she did not comply with his request to remove headphones.

Although instructed on justifiable and excusable homicide (CALCRIM Nos. 505, 511), the jury ultimately found defendant guilty of first degree murder (Pen. Code, § 187, sub. (a)). The trial court sentenced him to prison for 25 years to life.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

### *Admission of Diary Entries*

Defendant contends that he was denied a fair trial when the trial court erroneously admitted four entries from T.T.'s notebook in which she chronicled threats made by defendant. These entries were introduced as nonhearsay evidence of T.T.'s state of mind, but defendant insists the inflammatory nature of the entries would have made it impossible for the jury to consider the evidence for such a limited purpose. We disagree.

9

A. Additional Background

As referenced above, G.A. read some of T.T.'s diary entries to the jury as follows. "September 2006, he threatened me. He mentioned O.J. Simpson as the example of our marriage.[5] [¶] June of 2009. We all went to Ethiopia on vacation. The threat to kill me continued. He threatened me a lot. [¶] 2010, he threatened me of going to hair salon [*sic*]. He called me . . . and told me our chest drawer fell on my four-year-old son. And my son . . . got out of use [*sic*]. . . . [¶] I made a U-turn on two way highway illegally, drove like crazy to get home. When I got home, I saw him driving the van. He seemed like to stop. And when I got to him, he drive [*sic*]. I thought he was taking my son to hospital. [¶] . . . [¶] I was screaming and crying like crazy in public to know what happened. Finally he let my daughter out of the van. I asked my daughter 'what's going on?' [¶] She said 'nothing.' He threatened me. He said he'll set a fire on us [*sic*]. [¶] 2012, I went lunch with my coworker[s] . . . . I forgot to take my phone with me and missed my husband's call. He falsely accused me of cheating and said he was hoping . . . to go drive in the bridge. [¶] . . . [¶] He gets a bridge on the way to the library. He threatened me."

The coworker also read additional entries, which were admitted under Evidence Code[6] sections 1109 and 1370 and are not challenged here. These included an entry dated January 2014, in which T.T. related that defendant would not let her visit with family and threatened to set fire to the house. Another entry said, "Now 2014, things may change. Unfortunately not." T.T. also recorded, "He threatened me as usual. Even more." In the final entry read to the jury, T.T. related that in August 2014, she heard defendant tell family members that he had a plan to bring the kids to Ethiopia and that he

---

5      Defendant denied he threatened to end his marriage "like [how] O.J. did."

6      Undesignated statutory references are to the Evidence Code.

wished T.T. would die.  When T.T. told him she heard the conversation, he was very angry.  He asked T.T. to give him their son; she would keep their daughter and the house would burn.  T.T. refused and asked why not separate peacefully and sell the house?  Defendant said he would terrorize the family and teach the kids how to kill themselves.

After G.A. testified to the journal entries, the court told the jury that the diary entries dated September 2006, June 2009, 2010, and 2012 that describe alleged threats and interactions between T.T. and defendant were admitted as circumstantial evidence of T.T.'s state of mind.  The jury could consider them for that purpose only.  When instructing the jury at the conclusion of the evidence, the court repeated that these same entries were only admitted as circumstantial evidence of T.T.'s state of mind.

B.  Analysis

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see § 1200, subd. (a).)  "Hearsay is generally inadmissible unless it falls under an exception."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; see § 1200, subd. (b).)  " 'The proponent of hearsay has to alert the court to the exception relied upon and has the burden of laying the proper foundation.' " (*People v. Turner* (2020) 10 Cal.5th 786, 822.)

"[A] statement 'offered for some purpose other than to prove the fact stated therein is not hearsay.' "  (*People v. Sanchez, supra*, 63 Cal.4th at p. 674; see *People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001, 1019 ["A statement not offered for its truth is, definitionally, not hearsay"].)  Evidence offered for a nonhearsay purpose is still subject to exclusion on other grounds, such as relevance or undue prejudice.  (See *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 889.)  When nonhearsay evidence is admitted as such, it is advisable to give a limiting instruction to prevent the jury from considering the evidence for its truth.  (*Ortiz*, at p. 389; *Kovacich*, at p. 889; *People v. Wang* (2020) 46 Cal.App.5th 1055, 1080, fn. 9; § 355 ["When evidence is admissible . . . for one purpose and is inadmissible . . . for

another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"].) However, absent a request, the trial court generally is not required to give a limiting instruction. (*People v. Cowan* (2010) 50 Cal.4th 401, 479.)

Testimony about a victim's out-of-court statement reflecting his or her state of mind can be either hearsay or nonhearsay. (*People v. Riccardi* (2012) 54 Cal.4th 758, 823, abrogated on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) The distinction between hearsay and nonhearsay circumstantial evidence of a declarant's statement of mind was explained at length in *People v. Ortiz, supra*, 38 Cal.App.4th 377. "The evidence admitted under section 1250 is hearsay; it describes a mental or physical condition, intent, plan, or motive and is received for the truth of the matter stated. [Citation.] . . . [Citation.] [¶] In contrast, a statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind. [Citation.] . . . [Citation.] . . . [Citation.] [¶] The threshold determination is whether the proffered statement is hearsay, i.e., whether it is being offered to prove the truth of its contents. (§ 1200.)" (*Id*. at p. 389.)

We review a trial court's evidentiary rulings, including "its determination of issues concerning the hearsay rule," for an abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590.)

We disagree with defendant's contention that the entries were inadmissible because T.T.'s state of mind between 2006 and 2012 had nothing to do with her murder in 2018, as it was too remote in time and did not indicate she was contemplating a separation when she made the entries. T.T.'s state of mind was an issue at trial because statements made by defendant, both in and out of court, indicated that T.T. was causing problems in the marriage through her purported infidelity, by contemplating divorce, and her habit of excluding herself from the family every night after dinner. Indeed, defendant

12

claimed he was justified in or excused from killing T.T. because he was enraged by finding another man in their bedroom and because she physically attacked him. The pre-2014 entries provide insight into T.T.'s state of mind, not otherwise filtered through defendant's perception of events.

Specifically, they explain the genesis and ongoing nature of her fear, unhappiness, and contemplation of separation. The evidence was sufficient to draw the inference that T.T. contemplated separation early on but stayed with defendant because she was afraid of him and felt financially trapped in their marriage. T.T.'s contemplation of separation was intertwined with her fear of defendant.

The entries in 2010 and 2012, regarding defendant's false statements about an emergency involving their son, threats to set fire to the family, and threats to drive into or off of a bridge with the children, all provided circumstantial evidence of the expanding scope of T.T.'s fear. In fact, the latter two entries were circumstantial evidence of her fear for her children, which likely complicated any contemplation of leaving the marriage.

If the jury believed the journal entries reflected that T.T. was afraid of defendant, the evidence would also be relevant as circumstantial evidence that T.T.'s state of mind was not that of an initial aggressor, which would counter defendant's testimony that T.T. attacked him on the day of her death. Thus, the pre-2014 entries were admissible as nonhearsay evidence of T.T.'s state of mind, which was highly relevant to the issues the jury would wrestle with. (See *People v. Ortiz, supra*, 38 Cal.App.4th at pp. 385, 390-391 [victim's statements that the defendant "would make panting noises outside the bathroom door" while she bathed, "had intruded on her when she was in the shower," and that he had sexually assaulted her "would have been inadmissible as hearsay," but were admissible as nonhearsay as "relevant circumstantial evidence" of the victim's state of mind]; see also *People v. Brooks* (2017) 3 Cal.5th 1, 39 [testimony about victim's "statements that defendant had threatened to kill her" was admissible nonhearsay because the statements "were relevant circumstantial evidence that she was afraid of defendant"];

13

*People v. Riccardi, supra*, 54 Cal.4th at p. 823 [victim's "indirect declarations of her state of mind" that "contained descriptions or assessments of defendant's conduct that engendered [the victim]'s fear or altered her conduct—e.g., '[Defendant] kidnapped me at gunpoint' . . . were not hearsay to the extent they were admitted to prove circumstantially [the victim]'s state of mind or conduct"].)

Defendant contends that even if admissible, the court abused its discretion by not excluding the evidence under section 352. Defendant forfeited this argument by failing to assert it below. (*People v. Wilson* (2008) 44 Cal.4th 758, 790, fn. 6; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1103, fn. 11 [hearsay objection did not preserve claim of undue prejudice].) Acknowledging forfeiture may preclude our review, defendant argues his trial counsel provided ineffective assistance by failing to properly object.

In order to establish ineffective assistance of counsel, a defendant must show both that (1) his or her trial counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) that the deficient performance prejudiced the defendant in that it is reasonably probable the defendant would have obtained a better result but for counsel's defects. (*Strickland v. Washington* (1984) 466 U.S. 668, 689; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) Defendant fails to establish either.

Section 352 provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " '[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.)

Defendant's primary argument is that the contents of the pre-2014 entries were more prejudicial than probative, and that counsel had no excuse for failing to object on

these grounds. In particular, defendant contends the 2006 entry regarding O.J. Simpson was particularly prejudicial because the "acquittal of O.J. Simpson for killing his wife had generated widespread public outrage and animus, and it would have been impossible for many jurors to use the 2006 entry for the narrow and limited purpose for which is purportedly admitted, that is, as circumstantial evidence of [T.T.]'s state of mind, rather than as evidence of [defendant]'s propensity to murder." Defendant further contends that the 2009, 2010, and 2012 entries were also inflammatory because they involved threats to the family or children.

We acknowledge that statements admitted for a nonhearsay purpose present an increased risk of prejudice "if the jury is unable to distinguish between the truth of the matters asserted and the inferences concerning the declarant's state of mind." (*People v. Riccardi, supra*, 54 Cal.4th at p. 823.) The potential for such prejudice here, however, did not outweigh the probative value of the state of mind evidence. Shortly after the testimony regarding the pre-2014 entries, the court instructed the jury on the limited purpose for which the evidence could be considered. The court also repeated this instruction at the close of the case. We find nothing in the record that would rebut the presumption that the jury followed the court's directive. (*People v. Merriman* (2014) 60 Cal.4th 1, 71.) Defendant's argument to the contrary is mere speculation.

Further, we conclude the pre-2014 entries do not constitute evidence that would tend to evoke an emotional bias against defendant such that it tempted the jury to convict based on the emotional reaction. Indeed, we conclude the evidence—independent of the contested diary entries—that defendant committed first degree murder was overwhelming. For decades, defendant harbored suspicions of T.T.'s infidelity and, according to T.T.'s statements to coworkers, controlled her actions with repeated threats to harm her and their children. He told family members that he wished T.T. would die and investigated purchasing a single burial plot the month before he killed her. Defendant's account of his day to law enforcement was inconsistent with his account to

15

social services. And neither of those were consistent with either the cell phone location data or the surveillance videos, both of which indicated he was home for several hours prior to T.T.'s murder. In addition, a surveillance tape from two houses away from defendant's house recorded a woman screaming at about 12:57 p.m., which matches the possible time of T.T.'s death. Further, defendant's trial testimony conflicted with the physical evidence that indicated he killed her by strangling her for several minutes, rather than during a quickly evolving mutual combat scenario as he described. Finally, at no point prior to trial did defendant tell anyone that he was responsible for her death through self-defense or that he found another man in the house that caused him to act in the heat of passion, which challenged the credibility of his trial testimony. Under these circumstances, there was simply no risk that the jury found defendant guilty of murder as a result of emotional bias against him evoked as a result of the pre-2014 entries. (*People v. Doolin, supra*, 45 Cal.4th at p. 439.) Accordingly, we find the court did not err in admitting the evidence and trial counsel was not ineffective for failing to object on section 352 grounds. And, because we have found no prejudicial error in admitting the pre-2014 entries, we also reject defendant's due process claim. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"].)

II

*Failure to Inform Jury of Ruling and/or Strike Testimony*

The trial court did not specifically admit an entry from T.T.'s diary indicating that when her daughter H.T. threatened suicide, defendant encouraged her to do so. The entry also noted that T.T. called the police, who took H.T. to the hospital. At trial, the prosecutor asked defendant whether the police came to the house "because of an issue with your daughter" who was "feeling suicidal?" Defense counsel started to object, then waited for the answer. Defendant answered, "I don't perceive it that way. I think it was just something she said out of anger. But my wife made a big deal out of it, and she

16

decided to call the police." Defense counsel then objected and, outside the presence of the jury, the court sustained the objection. The court never told the jury that it sustained the objection or that defendant's answer to the question should be disregarded.

On appeal, defendant contends the failure to inform the jury to disregard defendant's response was prejudicial error by the court. However, the court generally has no duty to give a limiting instruction sua sponte. (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1316.) Because defendant did not request that the court admonish the jury that it sustained the objection or to disregard the impropriety, he forfeited the claim of trial court error. (*People v. Pearson* (2013) 56 Cal.4th 393, 425.)

Defendant claims, however, that his attorney's failure to object prior to defendant's answer and failure to request the court admonish the jury that the objection had been sustained and the answer stricken amounted to ineffective assistance of counsel. Defendant has failed to establish either deficient performance or prejudice. (See *Strickland v. Washington, supra*, 466 U.S. at pp. 687-694 [describing ineffective assistance of counsel as requiring proof of both deficient performance and prejudice].)

" 'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.]' " (*People v. Lopez* (2008) 42 Cal.4th 960, 966.) The record on appeal "rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored." (*Ibid.*)

17

In this case, it was established trial procedure—out of consideration for the interpreter—that the parties should not interrupt questions or answers and were required to wait until someone was finished speaking before objecting. The trial court reminded the parties of this procedure on several occasions.

Further, the question of admissibility of the *subject matter* of H.T.'s purported suicide is not as straightforward as defendant implies. Prior to trial, the prosecutor sought to admit T.T.'s diary entries that memorialized "threats Defendant made to kill her and the kids." The trial court's ruling on this motion identified the relevant entries and explained the basis for their admission. The entry regarding H.T.'s possible suicide threat did not readily qualify as a threat by defendant to T.T. or the children and was not specifically identified in the ruling. The trial court then tentatively excluded "all other parts of the notebook." But this tentative evidentiary ruling was limited to admission of the *diary entries*—not necessarily the subject matter referenced by the entries. This ruling was made without fully knowing what the trial evidence would show and, as a tentative order, was subject to reexamination at the request of a party who desired the introduction of the evidence. (*People v. Holloway* (2004) 33 Cal.4th 96, 133.) Indeed, it was only after defense counsel's objection that the trial court actually ruled that evidence of H.T.'s possible suicide threat was inadmissible. Thus, we are not convinced that the subject was conclusively excluded on a prior occasion such that defense counsel should have prevented defendant from answering the question, as he now claims.

Even assuming, however, that counsel performed deficiently either by allowing defendant to answer the question or by failing to request the court to inform the jury that the objection was sustained or to strike defendant's answer, we fail to see resulting prejudice. (Cf. *People v. Heldenburg* (1990) 219 Cal.App.3d 468, 475 [counsel's failure to press the court for an admonition to the jury resulted in waiving the issue on appeal].) The prosecutor asked whether the police were called because H.T. was "feeling suicidal." Although the referenced circumstances may have included a suicidal threat, the record

18

does not actually establish one was made. Whatever was said or done between H.T. and her parents, defendant testified that he did not perceive H.T. as feeling suicidal. Instead, he thought she was saying something out of anger and he suggested T.T. overreacted. This difference of opinion between parents regarding H.T.'s mental state—the circumstances around which we know nothing—does not necessarily lead a juror to conclude defendant was a "cruel man" who did not care if his own daughter might kill herself. And, even if we assume a juror drew that conclusion, it would require an additional speculative leap to then conclude that juror would have imputed any of defendant's feelings about a possible suicide threat by H.T. as a reason to find him guilty of murdering T.T. Such a leap is impermissible and factually unwarranted in this case.

III

*Rebuttal Witness*

Defendant contends he was denied a fair trial when H.T. was allowed to testify as a rebuttal witness. According to defendant, H.T.'s testimony would have been appropriate in the prosecution's case-in-chief, but was improper as a rebuttal witness when: she was not originally on the witness list, she was allowed to observe the entire trial despite a motion to exclude witnesses, and the substance of her testimony did not properly rebut defendant's testimony regarding family dynamics. Defendant further contends that H.T.'s testimony should have been excluded pursuant to section 352. The People contend that H.T.'s testimony was proper impeachment evidence and was thus appropriately offered in rebuttal. We agree with the People.

A. Additional Background

Before trial, the court granted defendant's request to exclude witnesses, with the exception of the investigating officer. H.T. was allowed to remain in the courtroom. The prosecutor stated that she was "not a witness. I have not subpoenaed her, nor am I'm going to [*sic*]."

19

Also prior to trial, the parties discussed the possibility of defendant seeking to portray himself as "a good and/or loving father," and the prosecutor requested such evidence be excluded. The court denied the prosecutor's request, finding that the motion was premature, and admissibility of character evidence would depend on the state of the evidence.

In a subsequent sidebar discussion, the prosecutor indicated that he had received "five or six statements" from witnesses that defense counsel intended to call to show evidence of defendant's character for honesty and peacefulness. The prosecutor objected as to honesty but acknowledged evidence of defendant's peaceful character was relevant. The court ruled that it would allow opinion and reputation evidence regarding defendant's character for honesty.[7]

During defendant's direct examination, defendant testified he considered himself "Mr. Mom" because he went grocery shopping, volunteered at the kids' schools, took the kids where they needed to go, and handled chores at the house. Defendant also said that he did not press T.T. about the affair because, "Our kids were the most important thing at the time for me." According to defendant, his children had never seen him be violent. To that end, the following exchange took place:

"[Counsel]: Let me ask you a question. In your relationship, did you ever threaten your wife with physical harm?

"[Defendant]: Absolutely not. In fact, my kids, the two kids that have lived with us their whole life, they can testify in open court that they've never ever witnessed me have a violent approach of any kind. Never. [¶] . . . I don't have a violent approach or outbursts. I've never threatened her in any way."

---

[7] Although the trial court did not specifically rule on the issue of defendant's character for peacefulness, we note the parties agreed such evidence would be admissible.

20

Subsequently, out of the presence of the jury, the prosecutor informed the court that H.T. wished to testify regarding other incidents of abuse. The prosecutor explained that H.T. previously refused to cooperate with the prosecution or to testify so he originally had no intention on calling her as a witness. However, the prosecutor explained, "I was approached last night by [H.T.'s] guardian and was told [H.T.] would be interested because I think she is concerned about the picture her father has painted of the family dynamics, which she believes is not accurate."

As an offer of proof, the prosecutor indicated that, "H.T. disclosed information consistent with the information disclosed back in 2018. Specifically, she disclosed that [defendant] is quick to anger; that, prior to [T.T.'s] passing, when she was either in her freshman year or her—in junior high, [defendant] came into her room. She was wearing headphones. He told her to take them off. She said no. [Defendant] struck her in the face, causing injury. Her face got really swollen."

Defense counsel objected, arguing that the statements had not previously been discovered, H.T. had been in the courtroom during the trial, and the evidence did not qualify as rebuttal evidence. The prosecutor counterargued that H.T.'s testimony properly rebutted the evidence of defendant's character for peacefulness. The court took the matter under submission.

After the defense rested its case, the parties readdressed H.T.'s testimony. On the same basis as before, defense counsel objected to H.T.'s testimony. The prosecutor indicated that the incident where defendant struck H.T. in the face was previously provided to the defense in discovery.

The court allowed H.T. to testify as a rebuttal witness, finding "that the fact that [H.T.] remained in the courtroom is not prejudicial to the defense because the Court would have allowed her to remain. I would have heard argument, but I believe she has a right under the California Constitution to be in the courtroom. The California Constitution says that." The court noted that it had the discretion to exclude witnesses,

"But I think the California Constitution guarantees the right for a victim or a family member of a victim to be present during all criminal proceedings including during testimony. So I would have allowed her to remain in the courtroom anyway. So I don't find that to be prejudicial."

The court further found that the evidence regarding the strike to the face was previously provided to the defense and was proper rebuttal evidence used to rebut "the defendant's testimony regarding the peaceful nature that he portrayed was occurring in the house and his love for his children and that he would do anything for his children." The court further ruled that "the fact that it could have been presented at the People's case in chief does not negate the fact that it is still rebuttal evidence."

In rebuttal, H.T. testified that on one occasion, she was listening to music with her headphones. Defendant asked H.T. to remove her headphones, but she refused. Defendant yanked the headphones out of H.T.'s ears and struck her in the face near her right eye, causing it to swell. Defendant and T.T. told H.T. not to tell anyone about the incident.

B. Analysis

The decision to admit rebuttal evidence rests largely within the discretion of the trial court and will not be disturbed on appeal in the absence of demonstrated abuse of that discretion. (Pen. Code, § 1093, subd. (d); *People v. DeSantis* (1992) 2 Cal.4th 1198, 1232.) "[T]he fact that the evidence in question might have tended to support the prosecution's case-in-chief does not make it improper rebuttal. [Citations.] It is improper for the prosecution to deliberately withhold evidence that is appropriately part of its case-in-chief, in order to offer it after the defense rests its case and thus perhaps surprise the defense or unduly magnify the importance of the evidence. Nevertheless, when the evidence in question meets the requirements for impeachment it may be admitted on rebuttal to meet the evidence on a point the defense has put into dispute." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 68.)

Defendant testified that both of his children "can testify in open court that they've never ever witnessed me have a *violent approach of any kind. Never.* [¶] . . . . *I don't have a violent approach or outbursts*." (Italics added.) In response, H.T. testified to one example of a violent outburst by defendant against her. H.T.'s testimony was properly admitted as direct impeachment of defendant's own testimony. " 'Rebuttal evidence is relevant and admissible if it tends to disprove a fact of consequence on which the defendant has introduced evidence.' " (*People v. Landry* (2016) 2 Cal.5th 52, 117, quoting *People v. Valdez* (2012) 55 Cal.4th 82, 169.) That includes testimony offered to impeach the credibility of defense witnesses by demonstrating their " 'character for honesty or veracity or their opposites.' " (*People v. Hines* (2020) 58 Cal.App.5th 583, 609, citing § 780, subd. (e).) "By taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139; see § 1101, subd. (c).)

While acknowledging the trial court's broad discretion to control the order of proof, the California Supreme Court has "criticized the tactic of waiting for cross-examination or rebuttal to use important evidence. If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be. [Citations.] [¶] The purpose of this restriction 'is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 330, superseded on other

grounds as stated in *Clark v. Brown* (9th Cir. 2006) 442 F.3d 708, 714, fn. 2.) Similarly, the court has made clear that evidence that is " 'obviously central to the criminal prosecution . . . should be proved as part of the prosecution case-in-chief.' " (*People v. Case* (2018) 5 Cal.5th 1, 49.)

The evidence at issue in this case is not of that character. H.T. recounted an incident of violence with defendant that, although consistent with the theme of prosecution, was not a material part of it. Rather, as allowed by case law, it was restricted to evidence made necessary by defendant's case. Defendant not only presented himself as a calm, peaceful person but he specifically asserted that his children could verify they have never seen a violent outburst from him *of any kind*. The prosecution was allowed to rebut this testimony with H.T.'s personal experience to the contrary.

We reject defendant's contention that H.T. was an improper rebuttal witness because she was permitted to sit through trial prior to her testimony. As defendant acknowledges, it was within the trial court's discretion to allow H.T. to remain in the courtroom. (See *People v. Valdez* (1986) 177 Cal.App.3d 680, 687; § 777, subd. (a) ["the court *may* exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses" (italics added)].) Beyond the mere fact that she heard defendant say something that she could rebut by relating her own personal experience, there is no indication her testimony was somehow influenced by her exposure to the trial evidence. Her testimony simply answered defendant's challenge that his children could verify he had never committed any violence. On this record, we find no abuse of discretion in permitting the rebuttal testimony. (*People v. Young* (2005) 34 Cal.4th 1149, 1199.)

Defendant further contends the trial court did not adequately weigh the potential prejudice of the evidence against its probative value under section 352. He has forfeited these issues by failing to argue them below. (§ 353, subd. (a); *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or

24

one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].) To facilitate review of the issue, however, defendant alternatively claims counsel provided ineffective assistance for failing to object on section 352 grounds. Ultimately, defendant's argument fails because we conclude he was not unduly prejudiced by H.T.'s testimony. (See *In re Cox* (2003) 30 Cal.4th 974, 1019 ["There are two components to an ineffective assistance of counsel claim: deficient performance of counsel and prejudice"].) Indeed, in light of the overwhelming evidence against him, there was no risk that the jury found defendant guilty of first degree murder in an effort to "punish" him for the fact that he previously struck H.T. (*People v. Doolin, supra*, 45 Cal.4th at p. 439.)

Finally, defendant contends the trial court's error in admitting the rebuttal testimony violated his Fourteenth Amendment right under the federal Constitution to due process of law. We have concluded that the trial court did not err in admitting the rebuttal testimony. (See *People v. Young, supra*, 34 Cal.4th at p. 1200.) And, because we have found no error in admitting the rebuttal testimony, we also reject defendant's due process claim. (See *People v. Partida, supra*, 37 Cal.4th at p. 439 ["the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*"]; see also *People v. Falsetta* (1999) 21 Cal.4th 903, 913 ["The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair"].)

IV

*Lay Opinion Testimony*

Defendant contends he was denied a fair trial when the court allowed, over his objection, T.T.'s friend to testify that defendant showed an exaggerated expression of grief at T.T.'s funeral. We find no prejudicial error.

" ' "A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony ([ ]§ 800, subd. (b)),

25

'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" [Citation.] Such a situation may arise when a witness's impression of what he or she observes regarding the appearance and demeanor of another rests on "subtle or complex interactions" between them [citation] or when it is impossible to otherwise adequately convey to the jury the witness's concrete observations. [Citations.] A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind. [Citation.] . . . A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion.' " (*People v. Sanchez, supra*, 63 Cal.4th at p. 456.) Lay opinion about a person's character, such as degree of empathy, remorse and cooperation, is a classic form of admissible lay opinion testimony. (See, e.g., *Pfingst v. Goetting* (1950) 96 Cal.App.2d 293, 304-306; *In re Marriage of Teegarden* (1986) 181 Cal.App.3d 401, 409.)

T.T.'s friend G.A. testified to several incidents that caused T.T. to fear defendant, whom the friend had never met. G.A. also read T.T.'s diary entries to the jury. She further testified, "At the burial, at the cemetery, I saw [defendant] just wailing and just— what felt to me as an exaggerated show of grief. It was very out of character." The court overruled the defendant's objection based on "[s]peculation." The friend added, "It was not what I expected given what I knew of their relationship and what I believed to have happened."

Although defendant contends the court erred in overruling the objection, the court acted within its discretion. (See *People v. Chatman* (2006) 38 Cal.4th 344, 397.) The friend testified that defendant's wailing "*felt to* [*her*] as an exaggerated show of grief." (Italics added.) Because the friend was a percipient witness, she spoke from personal observation. She was competent to testify that defendant's behavior and demeanor were consistent with exaggeration. (See *ibid.* [a witness providing lay opinion "may testify about objective behavior and describe behavior as being consistent with a state of

26

mind"].)  We find no error in admitting the friend's perception of defendant's behavior and demeanor.

It is a closer call, however, as to whether the friend's testimony that such behavior was "out of character" was proper lay opinion, especially since the friend had never met defendant and her understanding of his "character" was through discussions with the murder victim.  Assuming this statement was inadmissible we see no prejudice.  Given the overwhelming evidence of defendant's guilt, we find any error was harmless under either the applicable federal or state standard of review.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1222 [citing to both *Chapman v. California* (1967) 386 U.S. 18, 24 & *People v. Watson* (1956) 46 Cal.2d 818, 836]; see also *People v. Smith* (2015) 61 Cal.4th 18, 52 ["given the overwhelming evidence of defendant's guilt, . . . any error would have been harmless under any standard of prejudice"].)  For similar reasons, we reject defendant's contention that the error violated his federal right to due process through the Fourteenth Amendment.  "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida, supra*, 37 Cal.4th at p. 439.)  As we have found any error harmless, we cannot say that allowing testimony that defendant's show of grief was out of character rendered his trial fundamentally unfair.  Accordingly, we see no basis for relief.

V

*Cumulative Error*

Defendant further contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial.  "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)  " 'In examining a claim of cumulative error, the critical

27

question is whether defendant received due process and a fair trial.' " (*People v. Roberts* (2021) 65 Cal.App.5th 469, 482.)

"A predicate to a claim of cumulative error is a finding of error.  There can be no cumulative error if the challenged rulings were not erroneous.  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1382 [no cumulative error where court 'rejected nearly all of defendant's assignments of error'].)"  (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

Here, we have found minimal error that did not infect the trial such that it denied defendant's right to a fair proceeding.  And, to the extent we assumed error to address prejudice, any such assumed erroneous admission of evidence does not compound to warrant reversal.  (*People v. Lamb* (2024) 16 Cal.5th 400, 455.)  Our review of the record assures us that defendant received due process and a fair trial.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 716.)

DISPOSITION

The judgment is affirmed.

/s/<br>EARL, P. J.

We concur:

/s/<br>
RENNER, J.

/s/<br>
FEINBERG, J.

28